STATE OF NORTH CAROLINA v. ALVARO RAFAEL CASTILLO

No. COA10-814

(Filed 19 July 2011)

**1. Criminal Law— jury instruction—insanity defense**

The trial court did not commit plain error in a first-degree murder and assault case by failing to instruct the jury that the insanity defense applied if defendant believed due to mental illness that his conduct was morally right. Defendant failed to request a special instruction or show that absent the alleged error, the jury probably would have reached a different result.

**2. Criminal Law— prosecutor's argument—mental illness— failure to intervene ex mero motu**

The trial court did not err in a first-degree murder and assault case by failing to intervene *ex mero motu* during the State's closing argument regarding defendant's mental illness in light of the wide latitude accorded counsel in closing argument and the substantial and largely unchallenged evidence.

Appeal by Defendant from judgments entered 21 August 2009 by Judge R. Allen Baddour, Jr. in Superior Court, Orange County. Heard in the Court of Appeals 8 February 2011.

*Attorney General Roy Cooper, by Assistant Attorney General John G. Barnwell and Assistant Attorney General Derrick C. Mertz, for the State.*

*Appellate Defender Staples Hughes, by Assistant Appellate Defender Benjamin Dowling-Sendor, for Defendant.*

McGEE, Judge.

Alvaro Rafael Castillo (Defendant) was found guilty by a jury on 21 August 2009 of first-degree murder, discharging a weapon on educational property, discharge of a weapon into occupied property, two counts of assault with a deadly weapon with intent to kill, two counts of possession of a firearm on educational property, and three counts of possession of a weapon of mass destruction. The trial court arrested judgment on the three counts of possession of a weapon of mass destruction and one count of possession of a weapon on educational property. Defendant was sentenced to life imprisonment without the possibility of parole for first-degree murder. The trial court imposed a consolidated sentence of twenty-five to thirty-nine months in prison, to run consecutively to Defendant's life sentence, for: one count of assault with a deadly weapon with intent to kill, discharging a firearm on educational property, discharging a firearm into occupied property, and one count of possession of a weapon on educational property. The trial court also imposed a sentence of twenty-five to thirty-nine months in prison to run consecutively with the above sentences, for the remaining count of assault with a deadly weapon with intent to kill. Defendant appeals.

I. Facts

The facts of this case are tragic and largely undisputed. Defendant shot and killed his father in their family home in Orange County on 30 August 2006. Defendant then drove to Orange High School (the school) in Hillsborough. Defendant was armed with several homemade pipe bombs, smoke bombs, a sawed-off shotgun, and a rifle. After Defendant arrived at the school, he set off smoke bombs and discharged his rifle into the air. Defendant began to shoot at students who were standing outside of the school. Defendant continued shooting at students and at the façade of the school building until his rifle jammed. During the shooting, Defendant inflicted non-lethal injuries on two students. A school resource officer, London Ivey (Officer Ivey), along with Barry LeBlanc (Mr. LeBlanc), a teacher and former state trooper, approached Defendant when they realized

Defendant's rifle had jammed. They ordered Defendant to put down his weapons. Defendant complied and was arrested by Officer Ivey.

The investigation into Defendant's actions on 30 August 2006 revealed that Defendant had attempted suicide earlier that year, on 20 April 2006. The evidence presented at trial by Defendant tended to show that he was a mentally unstable young man, who idolized the perpetrators of the Columbine High School shootings in Columbine, Colorado in 1999 (the Columbine shootings). Defendant presented testimony regarding a journal he kept that showed he intended to kill himself with a shotgun on the anniversary of the Columbine shootings.

Defendant's father interrupted Defendant's 20 April 2006 suicide attempt, and Defendant was hospitalized for seven days. Defendant received outpatient psychotherapy until 24 July 2006. At that time, a dispute arose between the two clinics that were treating Defendant. As a result, Defendant received no treatment from 24 July 2006 until the shootings.

After Defendant's suicide attempt, Defendant began planning a school shooting of his own to mirror the Columbine shootings. Defendant purchased a rifle and ammunition. From 18 June to 20 June 2006, Defendant traveled to Columbine High School with his mother and, during the trip, bought a black trench coat. Defendant's journal around this time began to contain references to "sacrifice of students, sacrifice of family." Defendant also wrote in his journal: "I might save some children from sin." At trial, Defendant presented testimony from experts, as well as from his journal, that suggested Defendant considered his father's murder a sacrifice.

Defendant stated to the officers who accompanied him to jail after the shootings that he "was going to save those kids from sex, drugs, pornography, and abusive people like [his] father in their lives[.]" When Defendant's mother was allowed to visit him in the Central Prison mental hospital after his arrest, she asked him if he had anything to confess. Defendant replied, "what do I have to confess about? I didn't do anything bad. I did the right thing."

Several experts testified at trial that Defendant was unable to distinguish between right and wrong when he shot his father and attacked students at the school. Dr. James Hilkey (Dr. Hilkey), a psychologist who treated Defendant, testified that Defendant believed God had given Defendant signs directing Defendant to behave as he did. Dr. Hilkey testified that Defendant came to believe that his failed suicide attempt was the result of divine intervention, and a signal that

God wanted Defendant to end the suffering of other people by sacrificing people. Dr. Hilkey testified that Defendant knew that killing people by shooting them was legally wrong, but that Defendant believed it was morally right.

However, there was also evidence presented at trial that Defendant had a troubled relationship with his father. Dr. Nicole Wolfe (Dr. Wolfe), a psychiatrist at Dorothea Dix Hospital, testified that Defendant was severely mentally ill on 30 August 2006. However, Dr. Wolfe opined that Defendant "was capable of distinguishing between right and wrong at that time." Dr. Wolfe testified that Defendant carried out the school shootings because Defendant sought notoriety and "the people that he was imitating were his idols. He idolized Eric Harris and Dylan Klebold[,]" the shooters involved in the Columbine shootings.

In brief, Defendant presented evidence that he: (1) was a very troubled young man, (2) suffered from untreated or poorly treated mental disorders, (3) harbored anger for the world in which he lived, and (4) considered that world to be sinful and offensive. The issue in dispute was not whether Defendant was troubled or had mental disorders, but rather, exactly what the nature of Defendant's disorders were, and whether the disorders affected Defendant such that he was unable to distinguish right from wrong when he carried out his plans on 30 August 2006.

## II. Jury Instructions

[1] Defendant first argues that "the trial court committed plain error by failing to instruct the jury that the insanity defense applies if a defendant believed due to mental illness that his conduct was morally right." We disagree. Defendant did not request a special instruction at trial; therefore, this argument is limited to plain error review. *State v. Collins*, 334 N.C. 54, 62, 431 S.E.2d 188, 193 (1993).

We note that the trial court instructed the jury pursuant to the pattern jury instructions for the insanity defense. During the charge conference, Defendant did not request an instruction on the meaning of "wrong" in the context of whether he was able to distinguish right from wrong in his actions on 30 August 2006. Defendant did orally request a special instruction to inform the jury "about what's going to happen if they do render a verdict of not guilty by reason of insanity[,]" and that would result in Defendant's being committed to a mental institution. The trial court provided those instructions to the jury in conformity with Defendant's request.

Our Supreme Court has summarized the insanity defense as follows:

> In North Carolina, in order for a defendant to be exempt from criminal responsibility for an act by reason of insanity, he must prove to the satisfaction of the jury that at the time of the act, he was laboring under such a defect of reason caused by disease or a deficiency of the mind that he was incapable of knowing the nature and quality of his act or, if he did know the nature and quality of his act, that he was incapable of distinguishing between right and wrong in relation to the act.

*State v. Ingle*, 336 N.C. 617, 630, 445 S.E.2d 880, 886 (1994) (citations omitted). In the present case, the trial court gave the following instruction on the insanity defense, which substantially tracks the language in the Pattern Jury Instructions, N.C.P.I.—Crim. 304.10.

> When there is evidence which tends to show that the defendant was legally insane at the time of the alleged offense, you will consider this evidence only if you find that the State has proved beyond a reasonable doubt each of the things about which I have already instructed you. Even if the State does prove each of these things beyond a reasonable doubt, the defendant would nevertheless be not guilty if he was legally insane at the time of the alleged offense. I instruct you that sanity or soundness of mind is the natural and normal condition of people. Therefore, everyone is presumed sane until the contrary is made to appear.

> The test of insanity as a defense is whether the defendant at the time of the alleged offense was laboring under such a defect of reason from disease or deficiency of the mind, as to be incapable of knowing the nature and quality of the act or if he did know this, whether he was by reason of such defect of reason, incapable of distinguishing between right and wrong in relation to that act. This defense consists of two things: First, the defendant must have been suffering from a disease or defect of his mind at the time of the alleged offense; second, this disease or defect must have so impaired his mental capacity that he either did not know the nature and quality of the act as he was committing it, or, if he did, that he did not know that this act was wrong.

> On the other hand, it need not be shown that the defendant lacked mental capacity with respect to all matters. A person may be sane on every subject but one and yet, if his mental disease or defect with respect to that one subject renders him unable to

know the nature and quality of the act or to know that the act with which he was charged was wrong, he is not guilty by reason of insanity. Since sanity or soundness of mind is the natural and normal condition of people, everyone is presumed to be sane until the contrary is made to appear. This means that the defendant has the burden of proof on the issue of sanity—of insanity. However, unlike the State, which must prove all the other elements of the crime beyond a reasonable doubt, the defendant need only prove his insanity to your satisfaction; that is, the evidence taken as a whole must satisfy you not beyond a reasonable doubt but simply to your satisfaction that the defendant was insane at the time of the alleged offense.

In making this determination, you must consider all of the evidence before you which has any tendency to throw any light on the mental condition of the defendant, including lay testimony reciting irrational or rational behavior of the defendant before, during or after the alleged offense; opinion testimony by lay and expert witnesses or other evidence admitted. None of these things are conclusive, but all are circumstances to be considered by you in reaching your decision. If you are not satisfied as to the insanity of the defendant, the defendant is presumed to be sane; and you would find the defendant guilty.

Defendant argues that the term "wrong" as used in our State's body of law governing the defense of insanity means "moral wrong" and not "legal wrong" or "illegality." Defendant contends that, despite his failure to request a special instruction on the issue, the trial court committed plain error by failing to instruct the jury that the "insanity defense would apply if [Defendant] believed that his conduct was morally right, even if he understood that it was legally wrong." However, assuming, without deciding, that Defendant was entitled to a special instruction on the meaning of the term "wrong," we conclude that the trial court's failure to provide such an instruction was not plain error.

In adopting the plain error rule for North Carolina, our Supreme Court noted the following:

The adoption of the "plain error" rule does not mean that every failure to give a proper instruction mandates reversal regardless of the defendant's failure to object at trial. To hold so would negate Rule 10(b)(2) which is not the intent or purpose of the "plain error" rule. The purpose of Rule 10(b)(2) is to encourage

the parties to inform the trial court of errors in its instructions so that it can correct the instructions and cure any potential errors before the jury deliberates on the case and thereby eliminate the need for a new trial. Indeed, even when the "plain error" rule is applied, "[i]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court."

In deciding whether a defect in the jury instruction constitutes "plain error," the appellate court must examine the entire record and determine if the instructional error had a probable impact on the jury's finding of guilt.

*State v. Odom*, 307 N.C. 655, 660-61, 300 S.E.2d 375, 378-79 (1983) (citations omitted). " 'In order to prevail under a plain error analysis, defendant must establish . . . that "absent the error, the jury probably would have reached a different result." ' " *State v. Cummings*, 352 N.C. 600, 616, 536 S.E.2d 36, 49 (2000) (citations omitted).

Defendant states that "there was uncontested evidence that [Defendant] knew that his acts were legally wrong." However, Defendant asserts "that there was also uncontested evidence that . . . he believed that God wanted him to kill his father and [the] students." Defendant also asserts that "[i]t is highly probable that the jurors would have found [Defendant] not guilty by reason of insanity if the trial court had instructed them that 'wrong' means 'morally wrong.' "

Reviewing the theories of the case presented by the State and Defendant during trial, we find the issue of whether Defendant was able to distinguish moral right and wrong was clearly presented. For example, during his closing argument concerning insanity, Defendant's counsel argued as follows:

The fact that someone knows something is wrong legally or is against the law doesn't mean that they don't appreciate or know that it is morally wrong.

In other words, a person can commit an act that they know is against the law; but if they believe because they feel they are responding to a higher power, a higher calling, if they feel that that is the right thing to do, then the fact that they know it's against the law doesn't mean that that person can't be insane. So I think we need to—there has been a lot of talk about, well, you know, he spent this effort, you know. He went out there and he—he sawed this gun off, and he knew that was against law. Well, yeah. He knew it was against the law.

Did he know that killing people or shooting at people was against the law? We are not contending, and that's not part of—and has never been—a part of this defense, that he didn't know that it was against the law. But still—because of his mental illness and his delusional thinking, he felt convinced that this was the right thing to do.

Likewise, the State argued that the jury was to consider Defendant's actions and knowledge of legality and illegality to determine "whether [Defendant] was, by reason of such defect of reason, incapable of distinguishing between right and wrong." The State suggested that Defendant's knowledge of legality and illegality was "some evidence that [he] can work through the process of right and wrong that we might call moral right and wrong." While Defendant contends there was uncontested evidence that he believed God commanded him to kill, the State argued that Defendant's actions suggested otherwise and that Defendant was, instead, motivated by the same notoriety generated by the Columbine shootings.

Based on the theories involved in the present case, the question presented to the jury was whether, despite Defendant's knowledge that his intended actions were illegal, he took those actions under a delusion that he was doing so at God's command, thereby rendering him unable to distinguish between right and wrong. Thus, the theories presented to the jury directed the jury to focus on whether Defendant could distinguish right and wrong, not legality and illegality. Had the jury been given the instruction Defendant now advocates, the jury would have been required to determine the same issue: whether Defendant was under a delusion that God commanded him to kill his father and carry out a school shooting at Orange High School. We hold that, on these facts, the "wrongness" about which the jury was directed and instructed throughout the trial was clear; therefore, Defendant has not shown " 'that "absent the [assumed] error, the jury probably would have reached a different result." ' " *Cummings*, 352 N.C. at 616, 536 S.E.2d at 49 (citations omitted). Absent a request from Defendant for a special jury instruction about the particular definition of wrong, the trial court did not commit plain error in failing to provide an unrequested instruction on the definition of wrong.

### III. Closing Arguments

[2] Defendant next argues that the trial court erred in overruling his objection to a statement made by the State during its closing argument. However, in reviewing the transcript, we do not find that Defendant actually made any objection, nor that he obtained a ruling.

We first note that Defendant filed notice of appeal on 24 August 2009. Therefore, this appeal is subject to the version of the Rules of Appellate Procedure in effect on 24 August 2009. The Rules of Appellate Procedure were revised, effective 1 October 2009. We therefore apply the prior 2009 version of the rules. *See* N.C.R. App. P. 10. N.C. Rule of Appellate Procedure 10(b)(1) (2009) provided:

> In order to preserve a question for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context. It is also necessary for the complaining party to obtain a ruling upon the party's request, objection, or motion. Any such question that was properly preserved for review by action of counsel taken during the course of proceedings in the trial tribunal by objection noted or which by rule or law was deemed preserved or taken without any such action, may be made the basis of an assignment of error presented on appeal.

In the present case, the State's closing argument contained the following:

> The issue is: Does the mental illness rise to the level of insanity or did the mental illness rise to the level that it affected specific intent? And that's the diminished capacity argument that you are going to hear about. So that's something you really haven't heard a lot about until now, but you will have to consider that as to the first degree murder and the assaults because those have elements of specific intent in them.

> But—so the defense in his case, they are faced with the dilemma. You know what the defendant has been thinking about. You know about all these plans. You know about all these preparations. So a factual defense just isn't going to work. So where do you go next? Well, obviously because the defendant did have mental illness the next place to go is—

> [Defense Counsel]: Your Honor, may we approach?

> The Court: Yes.

> (A bench conference was held off the record and out of the hearing of the jury)

> [The State]: So anyway, so the defense—they have got a dilemma here. You are not going to have a factual defense in this case. It's going to come down to a mental health defense of some type.

Defendant contends that we may infer that he actually made an objection during this time; he further contends that "[a]lthough the trial court did not announce its ruling about the objection after the bench conference, the [State's] immediate repetition of [its] argument made it clear that the court had overruled the objection." However, Defendant cites no authority for his contention that we may infer a ruling. We find no reason to infer from the transcript that Defendant, when his attorney asked to approach the bench, made an objection during the exchange quoted above. Moreover, even had Defendant made an objection, the record does not reflect a ruling thereon.

"Where there is no objection, 'the standard of review to determine whether the trial court should have intervened *ex mero motu* is whether the allegedly improper argument was so prejudicial and grossly improper as to interfere with defendant's right to a fair trial.' " *State v. Gaines*, 345 N.C. 647, 673, 483 S.E.2d 396, 412 (1997) (citation omitted). In light of the "wide latitude accorded counsel in closing argument" and the substantial and largely unchallenged evidence presented in this case, "we cannot conclude that the argument at issue meets this test." *Id.* at 673-74, 483 S.E.2d at 412 (citation omitted). Defendant's argument is therefore overruled.

No error.

Judges BRYANT and BEASLEY concur.